# Ronnie Anthony Carter

## v.

# Commonwealth of Virginia

Record No. 850947

September 5, 1986

Present: All the Justices

*Roy H. Lasris (Buxton & Lasris, P.C.,* on brief), for appellant.
*Margaret Poles Spencer, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the court.

This appeal presents the question whether a person engaged in a criminal concert of action with others incurs vicarious criminal responsibility for the use of a firearm in the commission of a felony (Code § 18.2-53.1) by one of his co-actors in the absence of proof that he personally used the firearm or knew his co-actor possessed it. We also consider the propriety of a self-defense instruction in the context of the evidence.

Ronnie Anthony Carter[1] was tried by a jury in the Circuit Court of the City of Newport News and was convicted of first degree murder, robbery, and use of a firearm in the commission of a felony. The jury fixed his punishment at twenty years for murder, five years for robbery, and two years for the firearm conviction. Later, the trial court vacated the robbery sentence on double jeopardy grounds. Carter petitioned the Court of Appeals for an appeal of the murder and firearms convictions. The petition was denied by the Court of Appeals on October 28, 1985. We granted an appeal limited to the two questions mentioned above.

---

[1] Sometimes known as Ronald A. Carter.

A. *Vicarious Responsibility for Use of a Firearm by Another.*

The Commonwealth's evidence showed that Larry Alston, the victim, was standing outside a bar in Newport News at 2:00 a.m. on May 27, 1984. A witness, Leroy Deans, testified that he heard an argument between Alston and one Waverly Callicut, in which Callicut told Alston "to leave before he got hurt." Callicut, the defendant Carter, a third man known to the witness as "Leon," and a fourth man unknown to the witness, then surrounded Alston. Callicut again told Alston to leave; Alston said "okay" and walked away.

When Alston was about 20 yards away from the group, the witness heard one of its members remark that Alston "looked like he got some money." A woman standing nearby agreed that Alston had money, because he had bought her some drinks in the bar. The four men began following Alston, Carter and Callicut directly behind him, the other two moving parallel to them on the opposite side of the street.

Alston came to an open field and began to cross it. Leon and the unknown man got ahead of Alston and "cut him off." They stopped Alston while Carter and Callicut came up behind him. At this point the witness saw a flash and heard a gunshot, but could not tell who held the gun. Alston fell to the ground, and all four assailants searched his pockets. Leon then kicked Alston in the head and all four ran away.

A second witness, who could not identify any of the four assailants, heard the shot, saw four men standing over Alston and kicking him, and heard one of the men say "take everything he got." Alston died later that night of internal bleeding caused by a single gunshot wound. He had been shot in the back. His wallet, seen by other witnesses in the bar earlier in the evening, was missing. Small change was found on the ground near his body, and his pockets were pulled inside out and ripped at the seams.

Carter was arrested for these crimes on July 10, 1984. He made three conflicting statements to the police. First, he denied any involvement. His second statement contained admissions that he was present and hit Alston "one time" before a shot was fired by someone else, presumably a man named William Ellis, who was standing over Alston's body after Carter had started to walk away, heard the shot, and looked back. In Carter's third statement, he said that he heard the shot, saw Ellis standing over the body, returned, hit Alston, and took some money from his pockets.

There was no evidence offered by either side tending to show that Carter had actual knowledge that one of his co-actors possessed a firearm.

The Commonwealth argues on appeal that under the circumstantial evidence it presented, the jury could have believed that either Callicut or Carter himself fired the fatal shot, because the evidence placed both men behind the victim, who was shot from behind. Thus, says the Commonwealth, the jury might properly have concluded that Carter was a principal in the first degree with respect to both the murder and the firearm charge. The Commonwealth might have elected to present this theory to the jury as an alternative, but did not do so. Because it presented the case to the jury only on theories of Carter's vicarious responsibility for use of a firearm by another, we will not consider further whether the evidence supports his conviction as the actual perpetrator of the shooting. Instead, the Commonwealth presented, and the court granted, a standard principal-in-the-second-degree instruction and the following concert-of-action instruction:

## INSTRUCTION NO. 4

The Court instructs the jury if there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

■ In *Cortner* v. *Commonwealth*, 222 Va. 557, 281 S.E.2d 908 (1981), we held that one who never held or possessed a firearm might nevertheless be convicted as a principal in the second degree of the use of a firearm in the commission of a felony where he acted in concert with the gunman. Carter distinguishes *Cortner* by pointing out that the defendant in *Cortner* knew, throughout the execution of the robberies and abduction in that case, that his co-actor had and was using a firearm to further their common goal, to subdue the victims, overcome resistance, and effect the escape of both robbers by taking a hostage. Carter argues: "It is [the] absence of knowledge of the existence of the deadly weapon which distinguishes the instant case from [*Cortner*]."

 Carter posits a distinction without a difference. The Commonwealth's failure to prove that he had advance knowledge of his co-actor's possession of a firearm is immaterial. The evidence warrants the inference that he was one of four men, acting in concert, who decided to rob Alston; that they followed him, surrounded him, and accosted him; that it then appeared to at least one of them that shooting Alston would be expedient for their common purpose, and that the shooting was done as an incident of that common purpose. In these circumstances, each co-actor is criminally responsible for the shooting, even those who did not intend it or anticipate that it would occur. Because they shared the common intent to rob, they shared the common intent to commit all of the elements of robbery, including the use of such force, violence, or intimidation as would be expedient for the accomplishment of their purpose. An incidental probable consequence of such a shared intent was the use of a weapon, including a firearm if one should be at hand. In such circumstances, the law is well settled in Virginia that each co-actor is responsible for the acts of the others, and may not interpose his personal lack of intent as a defense.

In *Brown* v. *Commonwealth*, 130 Va. 733, 107 S.E. 809 (1921), Flynn Brown was ejected from a house of ill repute by Leroy White, its proprietor. He uttered a vague threat against White and left. He met two relatives, Moses and James Brown, and told them of the altercation. The three Browns returned to White's premises where Flynn Brown seized White and pulled him into the street. Moses Brown shot White and also, by a shot aimed at White which missed him, accidentally shot a bystander named Taylor.

 There was no evidence that Flynn Brown knew that Moses Brown had a gun with him. He testified that he never anticipated or intended any gunplay. Nevertheless, we affirmed Flynn Brown's conviction, as a principal in the second degree, of maliciously wounding White and assaulting Taylor, despite lack of proof that he personally intended the shootings. We quoted Wharton's Criminal Law with approval:[2]

> All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes proba-

---

[2] The court, in the present case, granted an additional concert-of-action instruction in substantially the same language.

ble, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime. * * * Hence, it is not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose.

*Id.* at 738, 107 S.E. at 811. Thus, the court correctly instructed the jury and the evidence is sufficient to support Carter's conviction, as a principal in the second degree, of the use of a firearm in the commission of a felony.

### B. *Self-Defense Instruction.*

Carter offered instruction "F":
The issue of self defense has been raised in this case, and on this subject, the court instructs you as follows:
One is acting in self defense when that person was without fault in provoking or bringing on the confrontation and if that person reasonably feared, under the the circumstances as they appeared to him, that he was in danger of great bodily harm.
If you find the above-factors present, then the killing was in self defense and you shall find the defendant not guilty of murder.

The court refused the instruction, noting that, as drawn, it made no distinction between Carter and the person who actually fired the shot. The Commonwealth argues that there was no evidence to support it. In order to decide this question, we must briefly turn to the defendant's evidence because, as noted above, the two witnesses for the Commonwealth gave no testimony remotely suggesting that Carter had any reason to fear danger to himself or, indeed, that he was without fault in bringing on the confrontation.
Carter presented only his own testimony and that of William Ellis. Ellis testified that he was "rolling reefer" outside the bar when Alston approached him, asking Ellis to sell him some marijuana; when Ellis refused, Alston assumed an aggressive stance, aiming kicks at him "like doing karate or judo"; that Ellis re-

treated but Alston advanced toward him, aiming more kicks at him; that he feared injury, drew out a loaded pistol he was carrying, and shot Alston in self-defense. Ellis said that he then ran away. He denied acting in concert with anyone and denied any participation in a robbery, but said that he saw Carter standing near Alston's body after the shot was fired. Carter testified that he saw Ellis and Alston talking outside the bar; that he walked away and heard a shot; that he saw Ellis leaving the scene and Alston lying on the ground; and that he then returned and went through Alston's pockets, hitting him once when Alston grabbed his arm.

The foregoing versions contain no facts which would warrant the giving of a self-defense instruction in Carter's case. Arguably, they might give some support to a self-defense instruction in Ellis' favor, but Ellis was not on trial. There was no evidence that Alston threatened Carter or that Carter acted in concert with Ellis. Thus, neither the Commonwealth nor the defendant offered any evidence to support a self-defense instruction, and the court properly refused it. "No instruction should be given unless it is supported by evidence, and such evidence must be more than a scintilla." *Le Vasseur* v. *Commonwealth*, 225 Va. 564, 590, 304 S.E.2d 644, 658 (1983), *cert. denied*, 464 U.S. 1063 (1984) (citing *Hatcher* v. *Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978)).

Finding no error in the trial court's rulings, we will affirm the convictions.

*Affirmed.*

STEPHENSON, J., dissenting.

Under Code § 18.2-53.1, a person who uses a firearm in the commission of certain enumerated felonies is guilty of "a separate and distinct felony." In *Cortner* v. *Commonwealth*, 222 Va. 557, 281 S.E.2d 908 (1981), we affirmed a conviction of an accused who never actually possessed the firearm used in a robbery but who acted in concert with the user. In *Cortner*, however, the defendant *knew*, throughout the execution of the underlying felony, that his confederate had and was using the firearm.

In the present case, there is no evidence that Carter knew or reasonably could have foreseen that his accomplice would use a firearm. Nevertheless, the majority affirms Carter's conviction of

use of a firearm in the commission of a felony, relying upon the doctrine of vicarious responsibility. Because there is no evidence proving either guilty knowledge or foreseeability, I would reverse the conviction.

Other jurisdictions have recognized that vicarious responsibility for use of a firearm during the commission of a felony requires at least circumstantial evidence that the accessory knows or can reasonably foresee that the principal will use a firearm. *See United States* v. *Douglass*, 780 F.2d 1472 (9th Cir. 1986) (applying the principle that a conviction of aiding and abetting the carrying of a firearm during the commission of a felony requires evidence giving rise to an inference that the accessories could reasonably foresee that the principal would carry a firearm); *People* v. *Tavolacci*, 88 Mich. App. 470, 276 N.W.2d 919 (1979) (requiring evidence sufficient to support an inference that the accessory knew his confederates were armed before affirming a conviction of aiding and abetting possession of a firearm during the commission of a felony).

Code § 18.2-53.1, a penal statute, must be construed strictly against the Commonwealth and "any ambiguity or reasonable doubt as to its meaning must be resolved in [an accused's] favor." *Ansell* v. *Commonwealth*, 219 Va. 759, 761, 250 S.E.2d 760, 761 (1979). The majority, however, gives the statute a most sweeping construction. Because I believe the majority applies Code § 18.2-53.1 too broadly, I respectfully dissent.